IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Steven Harold Cooper,<br><br>    Plaintiff,<br><br>vs.<br><br>United States of America, et al.,<br><br>    Defendants. | No. CV-15-2140-PHX-MHB<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

On March 6, 2017, this Court read her Findings of Fact and Conclusions of Law in Open Court after a bench trial in this matter. On March 14, 2017, the parties filed a Stipulated Motion Requesting Court to File Findings of Fact and Conclusions of Law and to Order Clerk of Court to Enter Judgment, (Doc. 141), requesting that this Court file written Findings and order the Clerk of Court to enter judgment. The Court grants the request. Following is the Court's Findings of Fact and Conclusions of Law, as read from the bench on March 6, 2017:

This matter came before this Court for a bench trial on February 27, 2017. After hearing approximately four days of testimony and the arguments of counsel, and pursuant to Rule 52, Ariz. R. Civ. P., this Court makes the following findings of fact and conclusions of law:

1. Carl T. Hayden VA Medical Center (VAMC) is located in Phoenix, Arizona.
2. Plaintiff Steven Cooper is a veteran, and served for eighteen years in the US Army and Army Reserve. He was born in 1970, and obtained a BA in criminal

|     |     |     |
| --- | --- | --- |
| 1 | | justice and master's degree in criminology while in the military. He was |
| 2 | | honorably discharged in 2007. |
| 3 | 3. | On December 17, 2011, Mr. Cooper was seen at the VAMC for a screening |
| 4 | | evaluation to facilitate his entry into the VA system. He complained of |
| 5 | | abdominal pain, among other symptoms. |
| 6 | 4. | Nurse Practitioner Shirlee Helton conducted a physical examination of Mr. |
| 7 | | Cooper, which included a digital rectal exam. |
| 8 | 5. | Nurse Helton found that Plaintiff's prostrate was "smooth, moderate, |
| 9 | | asymmetrical with left lobe slightly larger than the right, nontender, no |
| 10 | | modularity noted, 30 grams." |
| 11 | 6. | Nurse Helton advised Mr. Cooper that her digital rectal exam (DRE) indicated |
| 12 | | that his prostate was enlarged, but told him this was not concerning. |
| 13 | 7. | Approximately 11 months later, on November 26, 2012, Mr. Cooper returned |
| 14 | | to the VA clinic for abdominal issues and saw Dr. Raghunath Ramesh, an |
| 15 | | internist. |
| 16 | 8. | Dr. Ramesh noted the same DRE findings as Nurse Helton in his progress notes |
| 17 | | and immediately ordered a Prostate Specific Antigen test (PSA), a simple blood |
| 18 | | test which measures proteins found in the blood that were produced by prostate |
| 19 | | cells when there are changes in the prostate. The test result was a PSA level |
| 20 | | of 50. A retest three days later showed a PSA level of 43. A normal reading |
| 21 | | for Mr. Cooper would have been below a 2.5. Elevated PSA can be an |
| 22 | | indication of prostrate cancer. |
| 23 | 9. | Mr. Cooper was referred by Dr. Ramesh to urologist Dr. Theodore Mobley, |
| 24 | | who performed a biopsy of Mr. Cooper's prostrate on December 13, 2012. The |
| 25 | | pathology report showed that Mr. Cooper had aggressive prostate cancer, 90 |
| 26 | | percent cancer of left lobe and 50 percent cancer of right lobe, and that it had |
| 27 | | likely metastasized, and had a Gleason score of 4 plus 4. |
| 28 | | |

10. On December 21, 2012, Mr. Cooper went outside the VA system to private health care provider Dr. Kevin Bigelow, a urologic oncology surgeon.

11. Dr. Bigelow performed multiple tests to determine the extent of Mr. Cooper's cancer, and, based upon the prior pathology results, and the fact that the cancer had spread to a lymph node and seminal vesicles, and after consulting with Mr. Cooper concerning his options, scheduled radical prostatectomy surgery for January 23, 2013.

12. The radical prostatectomy involved the removal of Mr. Cooper's prostate and surrounding tissue, to include nerves, blood vessels and Plaintiff's urethra. Surgeries which Mr. Cooper has endured as a consequence of this surgery and the cancer have included:

1. urinary sphincter surgery, Mr. Cooper must use a hand pump to urinate, resultant infections to include MRSA infections.  Plaintiff has had three hospital admissions and surgeries for MRSA infections.

2. hernia repair surgery, although not necessarily caused by the cancer, but decidedly more painful.

3. osteoporosis, which has resulted in hip surgery and slower healing of bone related surgeries.

4. nerve graft surgery, which was the borrowing of tissue from Mr. Cooper's leg and resultant numbness.

5. bladder stone surgery, and the resultant pain associated with that surgery.

6. radiation therapy, which caused extreme pain, burning, urine and fecal incontinence and erectile dysfunction.

7. chemotherapy, which caused vomiting, nausea, and hair loss.

8. androgen deprivation therapy, that is chemical castration (Lupron) - two year therapy, resultant hip and sacrum fractures, breast growth, cognitive decline, and potential onset of dementia.

- 3 -

        9. a reduced life expectancy of approximately five years.

13.    Mr. Cooper's cancer is in remission, but if it returns, it will likely be incurable due to resistance to past treatments.

14.    As a result of his surgeries and treatments, Mr. Cooper is unable to work.

**CONCLUSIONS OF LAW.**

Under the Federal Tort Claims Act, liability is determined, under the facts of this case, in accordance with the substantive law of Arizona. Under Arizona law a Plaintiff, to prove medical malpractice, must demonstrate (1) the healthcare provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent healthcare provider in the profession or class to which she belongs within the state, acting in the same or similar circumstances; and, (2) such failure was the proximate cause of the injury.

Proximate Cause: Plaintiff must present facts from which negligence and causal relation between injury and defendant's acts may be reasonably inferred. Causation must be shown to be probable, not possible. A plaintiff must demonstrate a natural and continuous sequence of events stemming from defendant's negligence, unbroken by any efficient intervening cause that produces an injury in whole or in part and without which the injury would not have occurred.

The Court finds that Mr. Cooper has met his burden by proving by a preponderance of evidence that Defendant breached its duty of the standard of care, and that its breach is the proximate cause of Mr. Cooper's injury, that is, a radical prostatectomy and the resultant pain and complications, and incurable prostrate cancer. This conclusion is based upon the following findings.

1.    The standard of care required that Nurse Helton, given her DRE findings, practice shared-decision making with Mr. Cooper, and that Nurse Helton order a PSA diagnostic test and referral to a urologist.

- 4 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2. The standard of care was breached when Nurse Helton did not order a PSA test or refer Mr. Cooper to a urologist, and when she did not advise Mr. Cooper that asymmetry and enlargement are potential signs of prostrate cancer, and of his options to get a PSA test or to see a urologist.

3. Had Mr. Cooper been so advised, he would have sought to obtain a PSA test and consult with a urologist.

4. The court finds Mr. Cooper's expert Dr. Boyd credible. Dr. Boyd is a urologist specializing in urological cancers - for the past thirty-five years. He is a professor at USC, and chief of staff at the Norris Cancer Center, which is affiliated with the University. He has been involved in training urologic oncology fellows since 1982. Dr. Boyd testified that as an expert, he testifies three quarters of the time for the defense in these cases. Dr. Boyd testified that a prostrate in a 40 year old man should weigh between 20 and 25 grams. That prostrate cancer in 40 year old men is rare, and usually more aggressive than in older men: that asymmetry and enlargement are abnormal findings in a 40 year old and that the standard of care of a reasonable prudent healthcare provider in urology would require a PSA test and referral to a urologist, and would also require shared decision making: that based upon his review of all the pertinent medical records, that within a reasonable degree of medical probability, Mr. Cooper's cancer would have been confined to the prostate at the time of Nurse Helton's DRE, and would have been curable and would not have required such invasive treatment as a radical prostatectomy.

5. Dr. Boyd's opinion is supported by the expert opinion of Nurse Practitioner Maxwell, and treating physician Dr. Bigelow.

6. Nurse Maxwell, the Court finds, is qualified by academic background and area of practice as an expert in the standard of care for nurse practitioners in urologic oncology. She has conducted on average five to six DREs a week

- 5 -

|   |   |   |
|---|---|---|
| 1 |   | from 2001 to 2015.  She testified that the normal weight of a prostrate in a 40 |
| 2 |   | year old man is 15 to 20 grams, and that a DRE finding in a 40 year old man of |
| 3 |   | enlarged and asymmetrical prostate are abnormal findings, and that the standard |
| 4 |   | of care required that Nurse Helton order a PSA test and a referral to a urologist, |
| 5 |   | and that Nurse Helton engage in shared decision making, that is, advising Mr. |
| 6 |   | Cooper that the results were potentially signs of prostrate cancer and the option |
| 7 |   | of a PSA test and visit to a urologist.  She stated that she would have given Mr. |
| 8 |   | Cooper some literature on the subject.  Nurse Maxwell perhaps famously said |
| 9 |   | that what a medical professional needs, in the context of cancer, is foresight - |
| 10 |   | this sentiment is consistent with her opinion on the standard of care. |
| 11 | 7. | The Court finds credible treating physician Dr. Kevin Bigelow, a urologic |
| 12 |   | oncology specialist, with an impressive urologic oncology practice, in part |
| 13 |   | because he was not compensated as an expert in this case but had to be |
| 14 |   | subpoenaed by Plaintiff to appear at trial and at a deposition.  He also tracks |
| 15 |   | data from all of the patients he has treated since 2008.  He testified that an |
| 16 |   | enlarged prostate and an asymmetrical prostrate are potential signs of cancer, |
| 17 |   | and that if cancer is discovered while confined to the prostrate it is curable and |
| 18 |   | would not require a radical prostatectomy, just removal of the prostate, no |
| 19 |   | chemotherapy, no radiation and no androgen deprivation therapy. Dr. Bigelow |
| 20 |   | also testified, after having considered Nurse Helton's DRE findings, and |
| 21 |   | considering the medical records he reviewed relating to the biopsy, PSA tests, |
| 22 |   | pathology findings, and his own examination of Mr. Cooper and treatment, that |
| 23 |   | Mr. Cooper's prostate cancer would have been confined to the prostate at the |
| 24 |   | time of Nurse Helton's examination. |
| 25 | 8. | The Court finds the fact that Dr. Ramesh ordered an immediate PSA test and |
| 26 |   | referral to a urologist upon a DRE finding identical to Nurse Helton's, |
| 27 |   | corroborative of the opinions of Dr. Boyd and Nurse Practitioner Maxwell. |
| 28 |   |   |

1  9.   The Court does not adopt the contrary conclusions of Defendant's witnesses Nurse Practitioner Helton or Dr. Meng.

10.  The Court finds Nurse Practitioner Helton's opinion as to the standard of care internally inconsistent and inconsistent with the best practices set forth by the American Urologic Association. She testified that some 80 to 90 percent of men have enlarged prostrates, which does not reconcile with her "slightly abnormal" finding, and is inconsistent with the testimony of all of the other healthcare provider witnesses. Her testimony that asymmetry is also a benign finding, and that the presence of both asymmetry and enlargement is also a benign finding was also inconsistent with her deposition testimony. By Nurse Practitioner Helton's standard, a DRE would appear to be of very little utility in detecting early warning signs of prostrate cancer, which would likely be discouraging to the multitude of men who undergo DREs every year. Also, Nurse Practitioner Helton had no clear explanation as to why she did not simply share with Mr. Cooper her complete findings and advise him of his option to get a PSA or consult with a urologist.

11.  The Court finds that Dr. Maxwell Meng is highly qualified on paper as an expert, but discounts his testimony for the following reasons: Dr. Meng testified at trial inconsistently in many respect, with his deposition testimony as to what constitutes an abnormal finding, also added opinions at trial that were inconsistent with his statement in his written report that the report constituted all of his opinions. Dr. Meng's opinions were also somewhat at odds with the best practices as set forth by the American Urologic Association. And, with respect to the research study on active surveillance, Dr. Meng referenced during his testimony, the study would likely not have included in it 40 year old men, such as Mr. Cooper that had aggressive prostrate cancer with a PSA likely over 10. As Dr. Boyd aptly explained, there are no "watchful

      waiting" type research studies that follow men like Mr. Cooper who have aggressive cancer. Dr. Meng also was formerly employed by the VA as a physician, and currently teaches VA residents who rotate through his hospital.

12. The Court finds that the trial testimony established that prostate cancer is a "silent killer" in the sense that men report no symptoms until the cancer is very advanced, that if caught early, it is one of the most curable cancers, that cancer in 40 year old men is fairly rare. These findings further support the conclusion that the standard of care, upon finding that Mr. Cooper's prostate, at the age of 40 was enlarged and asymmetrical required a PSA test and a referral to a urologist, and that Mr. Cooper be given the full results of the DRE examination, advised that these are potential signs of prostate cancer and of his option to get a PSA test and see a urologist.

13. The Court does not consider the statements of Dr. Theodore Mobley as to cost savings somehow being a factor in not ordering a PSA test, as they were without foundation to establish that such savings were a factor set forth by the VA or adopted by Nurse Practitioner Helton, and in any event, it appeared that Dr. Mobley was conflating the concepts of PSA screening and diagnostic testing in his statements.

The Court finds that Plaintiff has proven that the violation of the standard of care was the proximate cause of Plaintiff's cancer spreading beyond the prostate and becoming incurable.

With respect to past and future lost earning capacity, the Court finds that the opinion of Defendant's witness Paul Bjorklund best supported by the facts.

Plaintiff has not made a substantial showing that his own services, efforts and initiative, rather than capital invested, or labor of others, was the predominant factor producing the profits of CEG - that the profits of CEG are so allied to his personal efforts that they are a reflection or near reflection of his earning capacity.

1  Additionally, the extensive corporate structure of CEG, as well as Mr. Cooper's
2  indication on his tax returns that no individual with CEG had more than a 20 percent
3  share in CEG supports this finding. Thus, as CEG is not a party to this lawsuit, the
4  Court will not consider CEG income or profit in calculating Mr. Cooper's economic
5  damages.

6  Additionally, the Court finds that averaging all of Mr. Cooper's personal
7  income, as set forth in the tax returns reviewed by Mr. Bjorklund, is the best reflection
8  of Mr. Cooper's future income. Although various explanations were offered as to why
9  Mr. Cooper's income would have fluctuated, the Court finds no adequate basis to
10 believe that one year or a combination of any years would be the best predictor of
11 future earnings. The Court also finds no adequate basis to find that Mr. Cooper's
12 income would follow an upward trajectory, had he not gotten the cancer, considering
13 the myriad of physical and mental health issues that Mr. Cooper was experiencing
14 prior to November, 2011, as documented in the medical reports and in his applications
15 for VA disability. Also, any future income related to Mr. Cooper's online education
16 ventures is speculative and somewhat inconsistent with Mr. Cooper's reporting of
17 income in his VA disability applications.

18 Thus, the Court will award Mr. Cooper the sum of $556,000 as representative
19 of his lost past earnings and the present value of his future earnings capacity.

20 The Plaintiff is entitled to an award for his pain and suffering.

21 **PAIN AND SUFFERING**.

22 As a proximate cause of Defendant's negligence, Mr. Cooper, as a former very
23 physically active 46 year old US Army Veteran, now has a shortened life expectancy,
24 and the quality of his life has greatly diminished, and he has and will continue to
25 undergo medical treatments and surgeries to mitigate the effects of his surgeries and
26 therapies, as noted previously.

27
28

- 9 -

Based upon the testimony of his treating physician, Mr. Cooper and his wife Rima, there is no question Mr. Cooper has suffered, and will continue to suffer physically and emotionally.  He suffers mental anguish from anticipating the recurrence of his cancer in a short period of time, and from anticipating the pain and suffering from dying of prostate cancer; he suffers the mental anguish of leaving behind his mother who is legally blind and caring for his sister who has severe mental disabilities, from the knowledge of not being able to contribute to their care, and the mental anguish of not being able to have a normal husband-wife relationship with his wife Rima, and from the knowledge of her having to act more as a nurse to him than a wife.  Mr. Cooper also suffers mental anguish from the loss of his dignity - unable to work, have children, have an erection.  Mr. Cooper has to wear diapers because of fecal and urinary incontinence and suffers from breast growth.  Additionally, Mr. Cooper suffers mental anguish from the impairment of his mental faculties, and the likelihood of effects of dementia.  Mr. Cooper also has lost a great deal of the enjoyment of his life.

Based upon the testimony of his treatment physician, Mr. Cooper and his wife Rima, there is no question that Mr. Cooper has suffered and will continue to suffer physical pain from his cancer, to include the pain of past surgeries, the pain of future surgeries, to include bladder stones, MRSA infections, and bone fractures.

The Court finds that an award of 2 million dollars ($2,000,000.00) is adequate compensation to Mr. Cooper for past and prospective pain and suffering.

It is therefore ordered finding for Plaintiff and against Defendant and that Plaintiff shall take judgment in the total amount of 2,556,000 dollars ($2,556,000.00)....

The above constituting the Court's Findings of Fact and Conclusions of Law read into the record on March 6, 2017, the Court now issues the following orders:

**IT IS FURTHER ORDERED** granting the Stipulated Motion Requesting Court to File Findings of Fact and Conclusions of Law and to Order Clerk of Court to Enter Judgment (Doc. 141).

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment for Plaintiff and against Defendant.

DATED this 17th day of March, 2017.

*Michelle H. Burns*
Michelle H. Burns
United States Magistrate Judge